# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| FRED HAYNES, *et al.,* | ) | CASE NO. 1:23-CV-00012-CEF |
| | ) | |
| Plaintiffs, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| v. | ) | |
| | ) | |
| SHANE SLATER, *et al.,* | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendants. | ) | **ORDER** |

Before the Court are Defendant Shane Slater's Motions for Summary Judgment against Plaintiff Fred Haynes (ECF No. 29) and Plaintiff Shannon Moneypenny (ECF No. 28).  Plaintiffs timely opposed Defendant's Motions.  (ECF Nos. 30 & 31).  Officer Slater filed reply briefs in support of his Motions.  (ECF Nos. 32 & 34).  For the following reasons, Officer Slater's Motion for Summary Judgment against Plaintiff Fred Haynes is **GRANTED**, and Officer Slater's Motion for Summary Judgment against Plaintiff Shannon Moneypenny is **DENIED**.

## I.    FACTUAL BACKGROUND

Plaintiffs filed this civil rights action under 42 U.S.C. § 1983 against Officer Slater and Officer Harold Lora.[1]  (ECF No. 1-3, Compl.).  Haynes claims that his Fourth and Fourteenth Amendment rights were violated on December 29, 2020, when Officer Slater allegedly used excessive force while arresting Haynes for failing to stop at a stop sign.  (*Id.* at PageID #10). Moneypenny claims that her Fourth Amendment rights were violated the same night, when Officer Slater transported her to the City of Linndale Police Station in handcuffs and against her will.  (*Id.* at PageID #12).

---

[1] Officer Lora was a named defendant but has since been dismissed.  (ECF No. 20).

### A. The Traffic Incident

#### 1. Initial Traffic Stop and First Encounter

At 6:50 PM on December 20, 2020, Officer Slater observed Haynes drive through a stop sign in front of the Linndale Police Department and initiated a stop.  (*Id.* at PageID #9).  The events of the traffic stop were recorded by body cameras worn by Officers Slater and Lora. (ECF No. 29, PageID #199–205; ECF No. 31, PageID #302).

During the initial encounter, Haynes pulled into a driveway and provided identification documents to Officer Slater.  (ECF No. 27, Body Cam. 18-50-48, 0:15).  Officer Slater asked about Plaintiffs' destination.  (*Id.* at 0:30).  Haynes gestured to the house next to the driveway claiming that he was going to visit a friend, and if Officer Slater was going to cite him, then he should "give [him] a ticket."  (*Id.* at 0:48).  The car did not belong to Haynes, but a friend identified in deposition testimony as Danny Salzman.  (ECF No. 23-1, Moneypenny Depo., PageID #88; ECF No. 24-1, Haynes Depo., PageID #120).

Haynes and Officer Slater then argued about whether Haynes committed a traffic infraction.  (*Id.* at 0:52–0:59).  Haynes shifted his body in the driver's seat with his back facing Officer Slater and began to search through the center console.  (*Id.* at 1:00–1:04).  Officer Slater advised Haynes to stop searching through the console and shined his flashlight into the car: "All right, don't be reaching around man.  Stop reaching around.  Keep your hands on the steering wheel.  How about that?  Keep your hands on the steering wheel until we're done.  Got me?  Don't be reaching around."  (*Id.* at 1:04–1:14).  Haynes complied, and after informing Haynes that his car insurance was expired, Officer Slater returned to his cruiser.  (*Id.* at 1:11–1:34).

### 2. Second Encounter and Events Leading to Haynes's Arrest

Officer Slater returned to the car a second time during the stop and asked Haynes why he was revving the car's engine.  (ECF No. 27, Body Cam. 18-55-08, 0:09–0:13).  Haynes claimed that he was trying to warm up the car.   (*Id.* at 0:15).  Officer Slater asked Haynes to "step out of the car for a minute."  (*Id.* at 0:18–0:20).  Haynes asked why he was asked to step out, and Officer Slater responded: "Because I'm asking you to step out of the car."  (*Id.* at 0:21–0:23).  Haynes again asked why he needed to get out, and Officer Slater reiterated, "I don't need a reason why, I just need for you to take your seatbelt off."  (*Id.* at 0:24–0:27).  Haynes interrupted Officer Slater before he could finish his statement: "I gave you my license and I gave you my insurance."  (*Id.* at 0:28).  The stalemate continued, with Haynes repeating that he already provided his license and insurance and Officer Slater asking him to get out of the car.  (*Id.* at 00:39).  Eventually, Officer Slater informed Haynes that he was being asked to get out of the car as a matter of officer safety.  (*Id.* at 0:36–0:38).

Haynes continued to disobey Officer Slater's commands.  (*Id.* at 0:39–0:44).  Officer Slater warned: "If you don't step out of the car, you're going to be under arrest."  (*Id.* at 0:45–0:47).  Haynes asked why, and Officer Slater responded: "Because I'm asking you to step out of the car."  (*Id.* at 0:49–0:51).  As the parties continued arguing, Haynes began making gestures with his arms and hands and tried to roll up the driver's side window.  (*Id.* at 1:12).  Officer Slater warned: "I will break your window.  Don't do it.  I'm telling you right now, don't be digging around."  (*Id.* at 1:13–1:20).  Haynes's hands were again in the center console searching for something.  (*Id.*).

Officer Slater commanded Haynes to keep his hands on the steering wheel.  (*Id.* at 1:21).  Haynes asked why he was told to do so while failing to comply.  (*Id.* at 1:25–1:28).  Officer

Slater again ordered Haynes to exit the vehicle; Haynes refused and asked for a reason why.  (*Id.* at 1:29–1:34).  This exchange of demands and disobedience continued for about another 30 seconds.  (*Id.* at 1:35–2:02).

### 3.  *Notification of Haynes's Arrest*

Officer Slater notified Haynes that he was under arrest and told him to step out of the car.  (*Id.* at 2:03–2:04).  Haynes asked why and rolled up his window; Officer Slater said he would break the window, and again asked Haynes to step out of the car.  (*Id.* at 2:05–2:04).  Haynes continued to ask for a reason why, removed his hand from the wheel, and reached for a bottle of water.  (*Id.* at 2:13–2:15).  Officer Slater told him to stop reaching around the vehicle, or else he would put a gun to his head.  (*Id.* at 2:15–2:19).

Haynes showed Officer Slater the water bottle and took a drink; his left hand was not in view.  (*Id.* at 2:19–2:23).  Officer Slater told Haynes to put the bottle down and said that if he did not get out of the car, he would break his window.  Haynes continued to drink the water in long, emphatic sips while Officer Slater requested his exit from the vehicle.  (*Id.* at 2:19–2:31).  Officer Slater told Haynes to exit the car three more times, for a sum of about twenty-three times over the course of the exchange, while Haynes asked why.  (*Id.* at 2:32–2:41).  Officer Slater then broke the driver's side window, reached through the window to unlock the door, and ordered Haynes to get out.  (*Id.* at 2:42–2:44).  A similar exchange of commands to get out of the car, and Haynes's inquiry as to why, continued as Officer Slater began to point his gun at Haynes.  (*Id.* at 2:42–2:51).

Haynes began to get out of the car with his hands up.  (*Id.* at 2:52–2:54).  When Haynes was on his feet, Officer Slater grabbed Haynes's arm with his free hand and guided Haynes's body toward the ground.  (*Id.* at 2:55–2:57).  Officer Lora had been standing behind Officer

Slater during the events described in the above paragraph.  (ECF No. 27, Body Cam. 18-54-04, 2:54–3:03).  When Haynes stood up, Officer Lora's body camera shows that Officer Slater used his free hand to grab a hold of Haynes's hand and wrist and pulled him downward toward the lawn next to the driveway.  (*Id.* at 3:08–3:11).  Officer Slater handcuffed Haynes while he laid prone before helping him back to his feet.  (ECF No. 27, Body Cam. 18-55-08, 3:07–3:47).  Officer Slater placed Haynes in the police cruiser soon after.  (*Id.* at 4:23–4:31).

### 4.  Seizure of Moneypenny

Officer Slater returned to the car and instructed Moneypenny to exit, informing her that she was being detained because the car needed to be towed.  (*Id.* at 4:39–5:17).  Moneypenny asked if she was allowed to go to the friend's house that they had intended to visit.  (*Id.* at 18:59:37).  Officer Slater told her, "Not right now"; in his deposition, Officer Slater explained that he did not allow her to do so out of concern for officer safety, such as an ambush or retrieving a weapon from the residence.  (ECF No. 33, Slater Depo., PageID #422–23).[2]  Though it appears in neither party's version of the facts, Officer Slater testified that, at the time of the stop, he thought he had both reasonable suspicion and probable cause to believe that Moneypenny "could have been subject to obstruction, the way she was interjecting herself into the situation with Fred Haynes. . . . Nothing she did helped the situation we had going with Fred Haynes. . . . [She] was making it more difficult to communicate with Fred Haynes."  (*Id.* at PageID #406–07).

Body camera footage confirms Officer Slater's recollection; as Officer Slater was commanding Haynes to exit the car, Moneypenny argued with Officer Slater from the passenger seat, stating, "everybody knows what kind of police officers are in Linndale," and insisting that

---

[2] The Court references Officer Slater's complete deposition transcript (ECF No. 33) rather than the selections of Officer Slater's deposition testimony attached to Moneypenny's Brief in Opposition, for clarity.  The portion of the transcript cited by the Court was not included in the portions provided by Moneypenny.

Haynes did not run the stop sign.  (ECF No. 27, Body Cam. 18-54-08, 0:50–0:58).  Moneypenny also contributed to Haynes's failure to obey Officer Slater's commands to exit the car, interjecting that Officer Slater owed Haynes a reason for the command to get out of the car, causing Officer Slater to reiterate, now to Moneypenny, that he "doesn't need a reason why, it's for officer safety."  (*Id.* at 1:46–1:50).  While Haynes rolled up his window despite Officer Slater's orders, Moneypenny can be seen shouting from the passenger seat, though the body camera did not pick up what she said.  (*Id.* at 1:17–2:09).  Officers Slater and Lora searched the car prior to having it towed.  (ECF No. 27, Body Cam. 18-54-04, 6:17–7:35).

Officer Slater loosened Haynes's handcuffs and ensured Haynes's seatbelt was securely fastened.  (ECF No. 27, Body Cam. 19-09-04, 0:00–1:03).  Moneypenny explained that Haynes had a previous "bad experience" with police, but stated that she understood why Officer Slater felt the need to break the car window.  (*Id.* at 0:36–0:46).  Officer Slater loosened Moneypenny's handcuffs.  (*Id.* at 2:10–2:44).  Moneypenny asked if she was going to jail, and Officer Slater confirmed that she was only being detained and was not going to jail.  (*Id.* at 2:34–2:37).  Moneypenny testified at her deposition that they drove across the street to the police station; she was immediately uncuffed and told she was free to go.   (ECF No. 23, PageID #87).  Moneypenny also testified that the drive was only a few minutes and that "it wasn't that long."  (ECF No. 23, PageID #87).

### 5.  Haynes's Statements at the Police Station and After

Officer Slater's body camera continued to record his interview with Haynes at the Linndale Police Station.  (ECF No. 27, Body Cam. 20-11-50).  Haynes signed his citations and asked Officer Slater for the reason Officer Slater wanted to get Haynes out of the car.  (*Id.* at 3:06–3:08).  Officer Slater explained that he was concerned for his safety when Haynes would

not keep his hands on the wheel and searched through the car; he explained that Haynes displayed concerning behavior and that he did not know Haynes, nor whether he had weapons in his car.  (*Id.* at 3:09-3:54).  Haynes responded, "You're right."  (*Id.* at 3:54–3:55).  He later added, however, that he had done nothing wrong.  (*Id.* at 4:27–4:29).

Since the arrest, Haynes testified at his deposition that he did not seek any medical treatment or incur any medical bills as the result of Officer Slater's conduct.  (ECF No. 24–1, Haynes Depo., PageID #131).  Haynes also testified that he did not see a psychiatrist, psychologist, or other mental health professional following this incident.  (*Id.* at PageID #132).

### 6. *Haynes's Conviction*

Haynes was charged with resisting arrest, obstruction of justice, and failing to stop at a stop sign.  (ECF No. 29, PageID #205).  As part of a plea bargain, the charges against Haynes were reduced to disorderly conduct and operation of an unsafe vehicle.  (*Id.*).  Haynes pleaded guilty to both charges.  (*Id.*; ECF No. 24–1, PageID #114–15).

## B.  Procedural History

The Complaint alleges Officer Slater conducted an unlawful arrest and utilized unreasonable, excessive force when he ordered Haynes out of his car, broke the window, forced Haynes to the ground, and handcuffed him.  (ECF No. 1, PageID #11–12).  The Complaint also alleges that Office Slater falsely arrested Moneypenny, having detained her in handcuffs at length and against her will.  (*Id.* at PageID #12).  Plaintiffs claim that they are entitled to compensation for their "physical pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety and loss of, rejection of, and/or denial of dignity, along with legal fees and costs."  (*Id.* at

PageID #13).   Plaintiffs seek compensatory, consequential, and punitive damages, a written apology, and attorney's fees and costs.  (*Id.*).

On January 12, 2023, Officer Slater answered Plaintiffs' Complaint.   (ECF No. 3). Officer Slater pleaded that he is entitled to qualified immunity, and that his conduct during the December 29, 2020 incident was reasonable and consistent with the Fourth Amendment.  (*Id.* at PageID #22).

Now on summary judgment, Officer Slater argues that Haynes's excessive force claim fails as a matter of law in light of the body camera footage recorded during the interaction.  (ECF No. 29, PageID #198).  Office Slater also asserts that he is entitled to qualified immunity because he did not violate a clearly established constitutional right under the circumstances.  (*Id.* at PageID #206).  As to Moneypenny's false arrest claim, Officer Slater argues that her temporary detention was not an unreasonable seizure, and that a detention of such manner and duration does not violate the Fourth Amendment.  (ECF No. 28, PageID #176).  Officer Slater therefore asserts that he is entitled to qualified immunity regarding Moneypenny's claim as well.  (*Id.*).

Haynes opposes Officer Slater's Motion.  (ECF No. 31).  Haynes argues that Slater's conduct constitutes excessive and unconstitutional force, stripping Officer Slater of qualified immunity.  (*Id.* at PageID #301).  Moneypenny's opposition argues that her transport to the police station, against her will after completing the traffic stop, was unjustified.  (ECF No. 30, PageID #219).  As a result, Moneypenny argues that Officer Slater is not entitled to qualified immunity.  (*Id.* at PageID #229).

## II.    MOTION STANDARD

Federal Rule of Civil Procedure 56(a) governs summary judgment and provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  A party asserting there is no genuine dispute as to any material fact must support that assertion by

> citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  In reviewing a motion for summary judgment, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990).  When the parties disagree about facts recorded on video, however, this Court "views the facts in the light depicted by the videotape." *Cunningham v. Shelby Cnty., Tenn.*, 994 F.3d 761, 763 (6th Cir. 2021) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).  Indeed, a factual dispute cannot be "genuine" when one of the parties' accounts of the facts is "blatantly contradicted" by a video recording. *Scott*, 550 U.S. at 380.

A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Id*. at 252.  Generally, "[c]redibility judgments and weighing of the evidence are prohibited."  *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).  At the same time, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

The moving party has the burden of showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).  The movant can meet his burden by either (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*.  If the moving party meets its burden, then the non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Zinn v. United States*, 885 F. Supp. 2d 866, 871 (N.D Ohio 2012) (quoting *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)).  Rather, the non-movant must point out specific facts in the record that create a genuine issue of material fact. *Id.* (citing *Fulson,* 801 F. Supp. at 4).

## III.    DISCUSSION

### A.    Title 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 confers a private right of action upon individuals to enforce rights secured by the Constitution and the laws of the United States. *Gonzagha Univ. v. Doe*, 536 U.S. 273, 285 (2002).  To prove a claim under 42 U.S.C. § 1983, a plaintiff "must establish . . . (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that he was subjected to or caused to be subjected to this deprivation by a person acting under color of state law." *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).

Plaintiffs' Complaint alleges that Officer Slater violated their respective Fourth Amendment rights.  Neither party disputes that Officer Slater was acting under color of state law in his role as a police officer when he arrested Haynes and detained Moneypenny.  The only

question is whether that conduct violated Plaintiffs' rights under the Constitution or the laws of the United States.

B.    **The Qualified Immunity Doctrine**

The doctrine of qualified immunity shields government officials from civil liability in the performance of their duties so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  Qualified immunity is not merely a defense to liability; the doctrine provides immunity from suit altogether.  *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019).  This form of immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and protects "all but the plainly incompetent or those who knowingly violate the law."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted).

Courts engage in a two-step inquiry to determine whether a defendant is entitled to qualified immunity: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred?  Second, was the right clearly established at the time of the violation?"  *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 247 (6th Cir. 2010)).  Although the plaintiff must satisfy both prongs to avoid the defendant's qualified immunity, courts have discretion to decide which of the two prongs to address first based on the issues of the particular case.  *Pearson v. Callahan*, 555 U.S. 223, 242 (2009); *Cunningham v. Shelby Cnty., Tenn.*, 994 F.3d 761, 764 (6th Cir. 2021).

Since qualified immunity presumptively protects a public official conducting his official duties, the plaintiff bears the burden of showing the court that it does not apply to the defendant's conduct. *Id.* (citing *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005); *see Mays v. City of Dayton*, 134 F.3d 809, 813 (6th Cir. 1998) ("While acting in his role of law enforcement officer, [the officer defendant] presumptively receives immunity for acts committed in the course of his duties.")). To do this, "the plaintiff must show a substantial correspondence between the conduct in question and prior law allegedly establishing the defendant's actions were clearly prohibited." *Hughes v. City of N. Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996).

### C. Motion for Summary Judgment Against Haynes

Haynes alleges that Officer Slater violated his Fourth Amendment right to be free from excessive force. (ECF No. 1-3, PageID #11–12). Because Haynes cannot show that Officer Slater violated a clearly established constitutional right or that his Fourth Amendment rights were violated, Officer Slater is entitled to qualified immunity with regard to Haynes's claims.

#### 1. *Clearly Established Right*

To determine whether a constitutional right was clearly established at the time of the incident, courts cannot define that right "at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, the right must relate to the particular conduct at issue in the case. *Id.* (quoting *Ashcroft*, 563 U.S. at 742). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force [and false arrest], will apply to the factual situation the officer confronts." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)). In other words, for the district court to deny

12

qualified immunity to a public official, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (2015) (citing *Ashcroft*, 563 U.S. at 731).

To show that a right was clearly established, the facts alleged in the complaint should be sufficiently clear that a reasonable officer would recognize that his conduct is unlawful under such circumstances. *Daily Servs., LLC v. Valentino,* 756 F.3d 893, 900 (6th Cir. 2014). The party raising qualified immunity bears the initial burden of coming forward with facts "to suggest that they were acting within the scope of their discretionary authority." *Id.* The burden then shifts to the plaintiff to show "that the defendants' conduct violated a right so clearly established that any official in defendants' positions would have clearly understood that they were under an affirmative duty to refrain from such conduct." *Id.* If the undisputed facts indicate that the defendant's conduct, as a matter of law, did not violate clearly established legal rights, then the Court must award summary judgment on qualified immunity grounds. *Poe v. Haydon,* 853 F.2d 418, 425 (6th Cir. 1988). However, summary judgment is inappropriate if there is a factual dispute involving an issue on which qualified immunity turns, such that it cannot be determined before trial whether the defendant acted in a manner that violated clearly established rights. *Id.* at 426.

Haynes argues that two Sixth Circuit cases clearly establish that Officer Slater's use of force during Haynes's arrest was excessive, and thus violative of the Fourth Amendment. First, in *Giannola v. Peppler*, 142 F.3d 433 (table), at *1 (6th Cir. 1998), police tried to stop a driver who was driving between 10 and 20 miles per hour below the speed limit. The driver was an elderly Italian man who did not speak English; he did not pull over, but continued driving slowly. *Id.* Additional officers arrived and managed to stop the driver, but out of concern for

13

their safety stemming from the driver's failure to pull over, officers approached the driver with their weapons drawn. *Id.* The driver locked himself in his car, placed his hands on the wheel (where they remained throughout the stop), and attempted to communicate with the officers outside. *Id.* While it is unclear how officers managed to open the car door, the driver alleged that the officers "grabbed [him], pulled him out of the truck, pulled his jacket over his head, knocked him on the ground, and handcuffed him." *Id.* The driver suffered a scraped hand, facial swelling, and contusions on his head. *Id.*

There was no body camera footage of the incident in *Giannola* and the parties' accounts of the events differed significantly: the driver's account contradicted the officer's recollection that they "applied pressure to [the driver's] wrists in an attempt to loosen his grip on the wheel," and after the driver got out of the car, the driver "went limp," prompting the officers to grab him to break his fall. *Id.* The Sixth Circuit reversed summary judgment for the officers on qualified immunity grounds because the Court was obliged to view the facts in a light most favorable to the driver: "We cannot say as a matter of law that, at least under plaintiff's version of the facts, the actions of officers . . . were objectively reasonable." *Id.* at *3.

Second, in *Hodge v. Blount Cnty., Tenn.*, 783 F. App'x 584, 585–86 (6th Cir. 2019), police stopped a hit-and-run driver—a sixty-seven-year-old man with vascular dementia. The driver's truck lurched forward twice before the officer had gotten out of his car, causing the officer to approach the truck with his weapon drawn. *Id.* at 586. The officer instructed the driver to get out of the truck, but though his hands remained on the steering wheel, he would not comply. *Id.* The officer holstered his weapon and opened the driver's unlocked door. *Id.*

Again, there was no body camera footage of the incident, and again, each party's version of the facts differed greatly from the other. *Id.* Like *Giannola*, the Sixth Circuit was

14

procedurally obliged to defer to the driver's version of the facts: after the officer opened the car door, the officer repeatedly instructed the driver to get out of the car, and the driver responded, with his hands still on the wheel, "What did I do?" *Id.* The officer eventually "violently jerked" the driver from his truck to the ground, where the driver "hit his nose hard on the pavement." *Id.* The driver, who was already in poor health, died soon after. *Id.* at 585. The Sixth Circuit found that the officer was not entitled to qualified immunity because he violated clearly established law; namely, *Giannola*: "[E]ven if *some* force were constitutionally reasonable, the degree of force at issue here—'violently jerk[ing]' [the driver] out of the vehicle hard enough for him to hit the ground face-first and sustain serious injuries—would have been clearly over the line under *Giannola*." *Id.* at 58.

Both cases are distinguishable from this one. Perhaps most notably, the *Giannola* and *Hodge* drivers both kept their hands on the steering wheel for the entire incident. According to law enforcement's version of the events, the *Giannola* driver's hands had to be pried off the steering wheel of his truck. *Giannola v. Peppler*, 142 F.3d 433 (table), at *1 (6th Cir. 1998). The *Hodge* court emphasized the driver's placement of his hands upon the wheel while explaining why the officer's use of force was excessive: "Hodge was an elderly man and obviously confused—not intoxicated, belligerent, or even argumentative. Hodge was certainly not brandishing a weapon—he had his hands on the steering wheel in plain sight throughout the encounter." *Hodge*, 783 F. App'x at 588. Haynes did not act similarly, and thus Officer Slater was not presented with circumstances like those in either case; instead, Haynes defied Officer Slater's repeated commands to keep his hands on the wheel in an argumentative, if not belligerent, manner.

Along with the lack of body camera footage in both cases, the force officers used on the *Giannola* and *Hodge* drivers was significantly greater than the force used by Officer Slater; the *Giannola* driver had head injuries and the *Hodge* driver died from the injuries he sustained from the officer's "violent jerk" and his fall to the pavement. Haynes did not have his jacket pulled over his head and get knocked down like *Giannola*, nor was he "violently jerked" out of his car like *Hodge*. Instead, Officer Lora's body camera shows that Officer Slater pulled Haynes to the ground by his hand and wrist after Haynes had gotten out of the car under his own power. (ECF No. 27, Body Cam. 18-54-04, at 3:08–3:11). Officer Slater's "pull" on Haynes's hand and wrist caused Haynes to first kneel on his right knee, then his left. (*Id.* at 3:10–11). Haynes managed to put his hands out in front of him to break any fall that might otherwise have occurred by moving from kneeling to prone. (*Id.* at 3:11–3:12).

In sum, Officer Slater was not presented with a situation similar to that which was present in either *Giannola* or its derivative, *Hodge*. Haynes pulled over when Officer Slater initiated his lights and sirens, so Officer Slater did not approach Haynes with his weapon drawn; Haynes had not fled an accident he caused or failed to stop when officers tried to pull him over. Haynes did not keep his hands on the steering wheel during the stop, and actually obscured his hands several times, despite Officer Slater's repeated commands for Haynes not to do so. Officers did not break a window in either *Giannola* or *Hodge*, rendering both cases irrelevant to Haynes's claims related to the broken window. And finally, Officer Slater did not "violently jerk" Haynes out of the car, nor pull anything over his head, nor cause him to fall on the ground too fast to break his fall. Instead, Officer Slater pulled down on Haynes's hand and wrist after Haynes got out of the car, and Haynes had the opportunity to support his descent to the grass with each of his knees

and both hands.  This Court therefore finds that Haynes has not met his burden to show that Officer Slater violated a clearly established law when Officer Slater arrested Haynes.

### 2. Violation of a Constitutional Right

Haynes claims that Officer Slater used excessive force during his arrest.  (ECF No. 1-3, PageID #11–12).  Officer Slater maintains that his conduct was objectively reasonable based on the circumstances with which he was presented.  (ECF No. 29, PageID #212–16).

### a. The Fourth Amendment's Protection from Excessive Force

The Fourth Amendment guarantees the right of free citizens to be free from excessive force.  *Baker v. City of Hamilton*, 471 F.3d 601, 602 (6th Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)).  At the same time, the Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396.  The use of force by law enforcement during an investigatory stop should be assessed under an "objective reasonableness" standard.  *Id.*  Courts determine whether an officer used reasonable force by balancing: (1) "the severity of the crime at issue"; (2) "whether the suspect posed an immediate threat to the safety of officers or others"; and (3) "whether the suspect is actively resistant or attempting to evade arrest by flight."  *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

An officer's conduct must be "'objectively reasonable' in light of the facts and circumstances confronting her, without regard to their underlying intent or motivation."  *Id.* (quoting *Scott v. United States*, 436 U.S. 128, 137–39 (1978); *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).  This inquiry accounts for the tense, uncertain, and rapidly evolving circumstances in which police officers are often forced to make split-second judgments about the appropriate

amount of force to use.  *Graham*, 490 U.S. at 396–97.  While the *Graham* factors are a helpful guide, the Sixth Circuit urges district courts to look at the totality of the circumstances surrounding the incident to determine whether the officer's use of force was reasonable.  *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022); *see Graham*, 490 U.S. at 395 (explaining that the reasonableness test "is not capable of precise definition or mechanical application").  Courts evaluate reasonableness from the perspective of an objective officer.  *Dunigan v. Noble*, 390 F.3d 489, 493 (6th Cir. 2004).

To determine whether an officer's actions are reasonable, the Sixth Circuit has adopted a "segmented analysis" approach; the officer's actions must be reasonable right before she allegedly used excessive force.  *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996); *Greathouse v. Couch*, 433 F. App'x 370, 372 (6th Cir. 2011); *see Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir. 1990) (segmenting whether it was reasonable for the officer to (1) draw his gun; and (2) not return his gun to his holster); *Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001) (analyzing separately whether officers violated the knock-and-announce rule and whether officers used deadly force against the plaintiff).  This segmented approach applies "even to encounters lasting very short periods of time."  *Greathouse*, 433 F. App'x at 372.

Here, the first segment of the traffic stop is the initial traffic stop itself and the parties' initial interactions.  Haynes concedes that this segment is "irrelevant" to his excessive force claim, as Officer Slater acted in a lawful capacity as a police officer in initiating a traffic stop. (ECF No. 31, PageID #306).  The second segment of the stop is during the second interaction between Officer Slater and Haynes, when Officer Slater began asking Haynes to step out of the vehicle.  Haynes does not base his excessive force claim on this segment.  (*Id.*).  Haynes

acknowledges that police officers have the lawful authority to ask individuals to get out of their cars during a traffic stop. *(Id)*.

Haynes's constitutional claim is based on the third segment, during which Officer Slater broke the window, unlocked the vehicle, and ultimately handcuffed and arrested him. *(Id)*. Haynes alleges that Officer Slater's conduct in this encounter constituted excessive force and violated the Fourth Amendment.

### b.     Severity of the Crime at Issue

Officer Slater stopped Haynes for failing to stop at a stop sign. Haynes was later charged with resisting arrest, obstruction of justice, and the stop sign violation. (ECF No. 29, PageID #205). As a part of a plea bargain, Haynes pleaded guilty to disorderly conduct and operation of an unsafe vehicle—minor misdemeanors. (*Id.*; *see* ECF No. 24-1, PageID #114–15). The Court finds that this factor weighs against Officer Slater's use of force.

### c.     Immediate Threat to the Safety of Officers or Others

#### i.     Breaking the Window and Unlocking the Door

The second *Graham* factor asks whether Haynes posed a threat to Officers Slater and Lora or others. *Graham v. Connor*, 490 U.S. 386, 396 (1989). When a driver evades arrest or acts erratically, a reasonable police officer is likely to be concerned that someone in the car may have a weapon or that the car itself may be used as a weapon, prompting that officer to act accordingly. *Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008) (finding that a reasonable police officer would reasonably believe a driver evading arrest or acting erratically posed a threat until he is "out of the car and handcuffed").

In *El v. City of Taylor*, No. 15-cv-12336, 2015 WL 7180472, at *1 (E.D. Mich. Nov. 16, 2015), police officers pulled over El to investigate an apparently fake license plate on his car. El

refused to provide officers with his driver's license, registration, or insurance information.  *Id.*
When officers ordered El to step out of the vehicle, he responded by locking his car door.  *Id.* at
*2.  Officers then broke his car window, unlocked the door, removed El from the car, and struck
El with a closed fist when he resisted the officer's handcuffs.  *Id.*  The court found that all the
officer's conduct was reasonable; relevant here, El's decision to remain in his locked car
constituted an effort to evade arrest, which justified breaking the window and unlocking the car.
*Id.* at *3.

In another similar case, after officers asked the driver to exit the vehicle, the driver
"appeared recalcitrant and proceeded to lock the car and close the window."  *Lavallis v.
D'Angelo*, No. 19-cv-10846, 2021 WL 388461, at *10 (E.D. Mich. Jan. 19, 2021), *report and
recommendation adopted sub nom. Lavallis v. Oakland Cnty.*, No. 19-cv-10846, 2021 WL
364254 (E.D. Mich. Feb. 3, 2021).  The driver "started moving around in the vehicle which
resulted in [the officer] being unable to see his hands."  *Id.*  The driver also "ignited the engine of
the vehicle" during the stop.  *Id.*  Considering these facts, the *Lavallis* court found:

> Based on Plaintiff's actions, Deputies were unable to discern threats
> Plaintiff may pose, what his intentions were and what his next actions
> would be.  Therefore, it was reasonable for Defendant Deputies to
> conclude Plaintiff may have a weapon in the vehicle, or may use the
> vehicle as a weapon and create a danger to Defendant Deputies and those
> surrounding the area.

*Id.*  The officer attempted to shatter the window of the driver's car, but after the first baton strike,
the plaintiff unlocked the door and informed the officer that the door was open.  *Id.*  The court
found that the officer's actions were objectively reasonable under those circumstances.  *Id.*

The event here occurred on a dark, winter evening.  Haynes argues that he was not an
immediate threat when Officer Slater broke the car window (ECF No. 31, PageID #308).
Reviewing the body camera footage, however, it is apparent that Officer Slater was becoming

concerned about his safety as the stop progressed.  Haynes refused to keep his hands visible on the steering wheel, instead tucking his hands into his large sweatshirt, reaching into the center console, and reaching toward  the passenger seat.[3]  When Officer Slater finally broke Haynes's window and unlocked the door, Haynes had been informed that he was under arrest; yet, like the drivers in *El* and *Lavallis*, he rolled up his window and disobeyed repeated commands to get out of his car.

This Court agrees with the district courts in *El* and *Lavallis*: A reasonable officer faced with circumstances like those faced by Officer Slater would have been concerned for his safety. Haynes refused to keep his hands in Officer Slater's view and evaded arrest by locking his door, rolling up his window, and refusing to exit the vehicle.  It is also noted that after Officer Slater's initial encounter with Haynes, the latter began revving his engine.  Haynes acknowledged Officer Slater's concern for his safety later at the police station, telling Officer Slater, "You're right," when Officer Slater told Haynes that he could not know whether Haynes or his passenger had a weapon within reach.   (ECF No. 27, Body Cam. 20-11-50, 3:54–3:55).  Therefore, this segment of the analysis weighs in favor of Office Slater.

> ii.  Haynes's exit from the vehicle and Officer Slater's conduct related to handcuffing Haynes

Haynes alleges that, after Officer Slater broke the window, Haynes began to exit the vehicle willingly.  (ECF No. 1-3, PageID #10; ECF No. 31, PageID #303).  This can be seen in the body camera footage as well.  ECF No. 27, Body Cam. 18-55-08, 2:52–2:54).  In the Complaint, Haynes then alleges that Officer Slater "grabbed Plaintiff Haynes'[s] left arm and

---

[3] As Haynes's hands left Officer Slater's apparent field of view, Officer Slater's voice became louder and his commands more authoritative.  (*see, e.g.*, ECF No. 27, Body Cam. 18-55-08, 1:19–1:25 (commanding Haynes to put his hands back on the wheel)); (*id.* at 2:16–2:20) (commanding Haynes to stop reaching around his car and threatening to put a gun to his head if he did not comply); (*id.* at 2:39–2:43) (observing Haynes's hand holding a water bottle move toward the passenger seat and breaking the window).

physically threw Plaintiff Haynes onto the nearby ground."  (ECF No. 1-3, PageID #10).  In response to Officer Slater's Motion for Summary Judgment, Haynes alleges that "Officer Slater's left hand pushes Haynes towards the ground, where Haynes falls face down in the cold snow." (ECF No. 31, PageID #303).

As the Court has explained, Haynes was not "thrown" to the ground.  Rather, Officer Slater pulled Haynes to the ground over the course of several seconds, allowing Haynes to use each of his knees and both hands to support his descent to the lawn.  (ECF No. 27, Body Cam. 18-54-04, 3:08–3:11).  Officer Slater then handcuffed Haynes before helping him back to his feet.  (ECF No. 27, Body Cam. 18-55-08, 3:07–3:47).  While Haynes describes his conduct immediately before being pulled to the ground and handcuffed as "holding a water bottle in a relaxed fashion," this Court has already found that Haynes belligerently disobeyed Officer Slater's commands to get out of the car, prompting his concern for his safety and escalating the situation.  Haynes points to no case law supporting his position that a reasonable officer concerned for his safety cannot handcuff an arrestee while he lies prone on the lawn.

This Court finds that Officer Slater's use of force—pulling Haynes to the ground slowly enough that Haynes could support himself before lying face down on the lawn—was justified based on the threat to Officers Slater and Lora's safety presented by Haynes.  This segment of the analysis also weighs in favor of Officer Slater.

### d.    Active Resistance or Fleeing

The third *Graham* factor considers the extent of Haynes's resistance against Officer Slater's commands.  The Court has already found that Haynes evaded arrest in the same ways in which both drivers in *El* and *Lavallis* evaded arrest.  *See El v. City of Taylor*, No. 15-cv-12336, 2015 WL 7180472 (E.D. Mich. Nov. 16, 2015) (finding evasion of arrest when the driver locked

his car door); *Lavallis v. D'Angelo*, No. 19-cv-10846 (E.D. Mich. Jan. 19, 2021) (finding evasion of arrest when the driver obscured his hands, locked his car door, and rolled up his window). Haynes does not address his evasion of arrest, and instead argues that he only passively resisted Office Slater's orders. (ECF No. 31, Page ID #308). To the extent that courts presented with similar facts have construed conduct like Haynes's as evasion of arrest, this Court sees no need to depart from a road already paved. This factor also weighs in favor of Officer Slater.

While the initial traffic stop may not have warranted force at the outset, the totality of circumstances which ensued render Office Slater's use of force against Haynes reasonable. The Court therefore finds that Officer Slater's use of force against Haynes did not violate Hayne's Fourth Amendment rights, and that summary judgment in Officer Slater's favor is appropriate.

### D. Motion for Summary Judgment Against Moneypenny

#### 1. False Arrest Legal Standard

Federal false arrest claims require plaintiffs to prove that the arresting officer lacked probable cause to arrest the plaintiff. *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (citing *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir.2005); *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir.2009)). Probable cause for arresting someone exists when the facts and circumstances known to the officer, along with information reasonably considered reliable, would lead a prudent person to believe that the arrestee has committed or is committing a crime. *Williams v. Schismenos,* 258 F. Supp. 3d 842, 859 (N.D. Ohio 2017), *aff'd*, 738 F. App'x 342 (6th Cir. 2018).

To begin, Officer Slater's assertion that Haynes's conviction establishes probable cause for the traffic stop is incorrect. When a § 1983 plaintiff enters a guilty plea in the preceding criminal case, that plea does not establish the propriety of the underlying arrest or officer

conduct.  *Sigley v. Kuhn*, 205 F.3d 1341 (Table) (6th Cir. 2000) (holding, as a matter of Ohio law, that a § 1983 action is not res judicata to a prior criminal proceeding in which the § 1983 plaintiff pleaded guilty); *see Haring v. Prosise*, 462 U.S. 306 (1983) (holding that a criminal defendant's guilty plea seldom bars him from later challenging the constitutionality of pre-plea police conduct).  This is because a guilty plea necessarily prevents the parties from presenting or contesting evidence surrounding the officer's actions, thus precluding any official determination of the legality thereof.  *Sigley*, 205 F.3d at *3.

That said, not every seizure is an arrest.  *Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) (citing *Michigan v. Summers*, 452 U.S. 692, 696–97 (1981) (holding that temporary detention of individuals while executing a search warrant on a home is a temporary seizure rather than an arrest; *Dunaway v. New York*, 442 U.S. 200, 207–08 (1979)); *see United States v. Enslin*, 327 F.3d 788, 797 (9th Cir. 2003) (applying *Summers* in the arrest context and finding that "similar to the 'mere inconvenience' of being ordered out of the vehicle, being required to show one's hands is simply too small an intrusion into [the defendant's] liberty to overcome the weighty interest in protecting officer safety").   At minimum, the parties agree that Moneypenny was not charged with a crime in connection to the traffic stop, though they dispute whether her temporary detention eventually became an arrest violative of the Fourth Amendment.

### 2. *Constitutional Violation*

The Court first finds that Moneypenny's removal from Haynes's car constituted a "seizure" under the Fourth Amendment.  In the context of a traffic stop, the temporary detention of individuals, "even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment.  *Whren v. United States*, 517 U.S. 806, 809–10 (1996).   The Fourth Amendment demands that such seizure is reasonable under the

circumstances.  *Id.* at 810.    Moneypenny concedes that Officer Slater could legally detain her during his search of the car, and instead bases her Fourth Amendment argument on Officer Slater's decision to transport Moneypenny to the Linndale Police Station after the stop's conclusion.  (ECF No. 30, PageID #232–33).  The Court finds that there is a genuine issue of material fact as to whether Moneypenny's continued detention during the drive to the police station violated her Fourth Amendment rights, implicating clearly established law of which Officer Slater, as a reasonable police officer, should have been aware.

Moneypenny's allegations in her opposition do not align with the body camera footage, nor her deposition testimony.    Regarding the length of time she was in the patrol car, Moneypenny states that she was placed in the back of the patrol car, then states: "A body camera recording by Officer Slater depicts questioning of Haynes at the Linndale Police Department with a timestamp of 20:11:54—this would amount to roughly an hour after Moneypenny is last seen handcuffed in the rear of Officer Slater's cruiser."  (ECF No. 30, PageID #222).  This statement is belied by Moneypenny's deposition testimony.  When questioned about how long she spent in handcuffs and in the back seat of the patrol car, she stated the following:

> Q.  Okay.  Do you have any idea how long you were sitting in the back of the vehicle?
>      You don't have to guess.
> A.   Roughly I would say probably 15 minutes.
> Q.  Okay.  And the next thing that happened is that they drove from the driveway across the street to the police station, is that correct?
> A.  Correct.
> Q.  Okay.  And it's my understanding that you got out of the vehicle first before Fred did, is that correct?
> A.  Yes.
> Q.  Okay.  And that they took off your cuffs right away?
> A.  Yeah.
> Q.  Okay.  And it's my understanding you were told that you were free to go, is that correct?
> A.  Yes.

(ECF No. 23, Moneypenny Depo., PageID #86–87).   Several questions later, Moneypenny offers that the drive from the location of the stop to the police station parking lot was "maybe five minutes at the most."  (*Id.* at PageID #93).   Therefore, by way of simple addition, the duration of Moneypenny's time in the police cruiser amounts to around 20 minutes.

Viewing the facts in the light in which they are depicted in the body camera video, a reasonable juror could find that Moneypenny was detained for longer than necessary to secure Haynes and the scene of the traffic stop.  Between the body camera footage, discovery responses, and deposition testimony, Officer Slater offers various justifications for transporting Moneypenny to the police station.  During the incident, upon hearing Moneypenny's question about whether she was going to jail, Officer Slater responded that she was not going to jail and was merely detained.  (ECF No. 27, Body Cam. 19-09-04, 2:34–2:37).   In response to an interrogatory asking for Officer Slater's basis for transporting Moneypenny to the police station, he stated, "Plaintiff Haynes's car was being towed and it was around 27 degrees outside.  I did not think it was appropriate to leave Plaintiff Moneypenny by the side of the road in the cold, by herself, at night.  Moneypenny was transported to the Police Station and the handcuffs were removed within 1-2 minutes after arrival." (ECF No. 28, PageID #184).  Then, at his deposition, Officer Slater testified that he believed Moneypenny was "subject to obstructing, the way she was interjecting herself into the situation that we had with Fred Haynes."  (ECF No. 33-1, PageID #406).  He later testified that the reason he left Moneypenny in his police cruiser and drove her across the street to the police station was because he had not yet decided whether to charge Moneypenny with obstruction.  (ECF No. 33-1, PageID #424–25).  It is undisputed that Officer Slater did not charge Moneypenny with obstructing official business.

Reviewing the body camera footage, Moneypenny interjected herself into Officer Slater's questioning of Haynes, seconded Haynes's demands that Officer Slater explain why Haynes had been ordered out of the car, and was shouting during Slater's encounter with Haynes, causing chaos in an already tense situation.  (ECF No. 27, Body Cam. 18-54-08, 0:50–0:58; 1:17–2:09).  A reasonable officer faced with these circumstances *could* believe he had probable cause to arrest Moneypenny for obstructing official business, which Ohio defines as preventing, obstructing, or delaying "the performance by a public official of any authorized act within the public official's official capacity . . . that hampers or impedes a public official in the performance of the public official's duties."  Ohio Rev. Code Ann. § 2921.31(A).  *See, e.g.*, *Burr v. Perkins*, No. 2:04-CV-786, 2006 WL 2165701, at *6 (S.D. Ohio Jul. 31, 2006) ("Repeated interruptions or disruptions of an officer's questioning of an individual *may* provide probable cause for obstructing official business under [Ohio Rev. Code Ann.] 2921.31(A)."); *Marsili v. Village of Dillonvale, Ohio*, 2014 WL 1922236, at *16 (S.D. Ohio May 13, 2014) (charging individual with obstruction of justice for distracting officer by interjecting and jumping up and down during witness questioning).

Moreover, police officers owe an affirmative duty to individuals both in their custody *and thereafter* to ensure the safety of those individuals.  *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.").  This Circuit and others have long upheld

*DeShaney*'s mandate.[4]  Officer Slater's deposition testimony demonstrates his knowledge of this duty: "If the scene is unsafe, that's essentially when we would [transport a person to another location].  If there's any risk to them whatsoever, it's safer to transport them to somewhere we know is going to be a safe location and release them there."  (ECF No. 33-1, PageID #403–04).

    As previously stated, the Court must view the facts as they appear in the body camera footage.  *Cunningham v. Shelby Cnty., Tenn.*, 994 F.3d 761, 763 (6th Cir. 2021) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).  Here, the body camera footage is devoid of any indication that Officer Slater intended to charge Moneypenny with a crime; he assured her that she was only detained and not going to jail, acknowledged that she was not a threat to him or his partner, and never threatened Moneypenny with an arrest to obtain her compliance.  Officer Slater does not argue that he was fulfilling an affirmative duty to protect Moneypenny's personal safety in his Motion or Reply, nor that he had probable cause to arrest Moneypenny for obstructing official business.

    Instead, Officer Slater simply argues that Moneypenny cannot defeat qualified immunity.  He points to *Hayward v. Cleveland Clinic Found.*, 878 F. Supp. 2d 860, 867 (N.D. Ohio 2012) and *DePaolo v. Brunswick Hills Police Dep't*, No. 1:05-CV-944, 2007 WL 2071947, at *9 (N.D. Ohio Jul. 17, 2007) as analogous cases that support qualified immunity against Moneypenny's claim, but neither case applies to this one.  In *Hayward*, two innocent bystanders were detained

---

[4] *See, e.g.*, *Davis v. Brady*, 143 F.3d 1021, 1025 (6th Cir. 1998) ("A duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger."); *Schneider v. Franklin Cnty., Ohio*, 288 F. App'x 247, 253 (6th Cir. 2008) (reversing summary judgment based on qualified immunity when passenger with ankle injury was forced to exit vehicle, causing her to fall and break the ankle); *Stemler v. City of Florence*, 126 F.3d 856, 868 (6th Cir. 1997) (reversing dismissal based on qualified immunity when a woman stopped by police was forced to leave the scene under threat of arrest with her intoxicated boyfriend, who later crashed and killed the woman); *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (reversing summary judgment on qualified immunity grounds where an officer arrested a driver and left the driver's three minor children in the driver's abandoned car on the side of the road and exposed to the cold); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) (finding that an impounded vehicle's passenger plausibly alleged a due process violation, in which the officer abandoned the passenger on the side of the road at 2:30 AM in a high-crime area).

at gunpoint while officers arrested suspects and escorted them out of the house, but there was no suggestion that officers held those bystanders after the suspects were arrested and removed.  878 F. Supp. 2d at 866–67.[5]  Similarly, in *DePaolo*, two individuals were detained while police arrested a suspect and escorted him out of the house, but the individuals were released immediately thereafter.  2007 WL 2071947, at *2.  Neither case involves officers holding detained individuals for any period of time *after* the scene was secure.

Officer Slater's conduct collides headlong into the Supreme Court's *Dunaway* decision. Officer Slater's continued detention of Moneypenny went beyond investigating suspicions and searching the car; the body camera footage does not support Officer Slater's testimony that he thought he had probable cause to arrest Moneypenny for a crime.  *See Dunaway v. New York*, 442 U.S. 200, 212 (1979) (requiring probable cause to seize an individual and transport that person back to the police station for interrogation).  While the Court is mindful that Moneypenny's ride across the street in Officer Slater's police cruiser lasted "maybe five minutes at the most" (ECF No. 23, PageID #93), that fact cuts against Officer Slater's argument that he took Moneypenny to the police station because it was cold outside; Moneypenny could just as easily have walked across the street to the shelter of the police station to access warmth and a phone to call for a ride.  Nonetheless, given Slater's conflicting reasons for the continued seizure of Moneypenny and viewing the evidence in the light of the body camera footage, a reasonable juror could find that Officer Slater's decision to transport Moneypenny to the Linndale Police Station violated Moneypenny's Fourth Amendment rights.

---

[5] *Hayward* was reversed in part by the Sixth Circuit in *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 621 (6th Cir. 2014), but the decision regarding the bystanders' assault claim was affirmed.

2.  *Clearly Established Law*

Moneypenny also satisfies the second prong of the qualified immunity analysis. While her reliance on *United States v. Obasa*, 15 F.3d 603 (6th Cir. 1994) appears misplaced,[6] her citation to *Eisnnicher v. Bob Evans Farms Rest.*, 310 F. Supp. 2d 936 (S.D. Ohio 2004)) is on point. In *Eisnnicher*, police stopped a car carrying four individuals believed to be part of local burglary activity. *Id.* at 944. When the car stopped, Ms. Eisnnicher got out of the car and began yelling at officers, who had their guns drawn. *Id.* Officers ordered her to "put her hands up, to move to a specific location and stay there, and to 'shut up.'" *Id.* Ms. Eisnnicher was agitated, yelled at officers, and poked one of the officers in the chest with her finger. *Id.* When officers determined that none of the individuals had committed a crime, they were all released, including Ms. Eisnnicher. *Id.*

The Southern District of Ohio denied the police officers' motions for summary judgment on qualified immunity grounds. *Id.* at 956. The court held that *Pray v. City of Sandusky*, 49 F.3d 1154 (6th Cir. 1995) (mistaken detention of and use of force against elderly couple after entering wrong duplex unit) and *Ingram v. City of Columbus*, 185 F.3d 579 (1999) (officer right to detain individuals while securing the scene of an otherwise lawful stop) should have caused the officers

---

[6] There, Obasa and his brother arrived at the airport from a flight that was the subject of a drug-courier investigation. (*Id.* at 604). When the brothers separated, Bunning, an investigator, questioned Obasa's brother in the airport and discovered evidence of credit card fraud. Suspecting that Obasa was part of the same scheme and learning that Obasa had left the airport in a taxi, Bunning used his radio to engage backup, which eventually stopped Obasa's taxi. (*Id.*). When Bunning arrived at the scene of the stop, Obasa denied that he was at the airport and Bunning was unable to connect Obasa to the credit card scheme. Still, Bunning gave Obasa a Miranda warning, searched him, and transported him back to the airport police station where he was later arrested based on more evidence found in his brother's suitcase. (*Id.* at 605). Obasa sued, claiming he had been unlawfully arrested during the taxi stop. The Sixth Circuit found that Obasa had been unlawfully arrested; Bunning's actions went beyond merely investigating his suspicions about Obasa because Bunning found no evidence during the stop connecting Obasa to his brother's criminal activity. The Court found the Miranda warning particularly significant: "If a detention that Bunning insisted was only a Terry stop 'had denigrated into a custodial interrogation' in which Bunning thought that a Miranda warning was required, the decision in *Dunaway* appears to require probable cause for further detention." (*Id.* at 607) (citing *United States v. Knox*, 839 F.2d 285, 297 (6th Cir. 1988)). Given the importance of the *Miranda* warning to the Sixth Circuit in *Obasa*, and given the significantly different facts of that case, the Court cannot find that *Obasa* clearly established a right of which Officer Slater should have been aware when he transported Moneypenny to the police station.

to know that Ms. Eisnnicher "could no longer be detained once the danger had passed." *Id.* at 955–56. Specifically, the court found that those cases "are sufficient to alert an officer of reasonable competence that a person detained either by mistake or in order to secure the scene of an otherwise lawful stop may not be detained any longer than necessary to effectuate the purpose of the detention." *Id.* at 956. The decision is unclear about how long Ms. Eisnnicher was detained after officers knew that the individuals were not dangerous; the decision merely states that "the stop lasted approximately 15 to 17 minutes." *Id.* at 944.

Neither *Pray* nor *Ingram* concerned a traffic stop, and neither case lends further understanding to the state of the law as it applies to Moneypenny's false arrest claim. But *Eisnnicher* involved circumstances similar enough to those faced by Officer Slater that he should have known Moneypenny's continued detention was constitutionally impermissible. While the stop did not involve an ongoing investigation, it did involve the detention of a passenger while officers searched a car. It also involved a detention (albeit for a matter of minutes) that exceeded the time it took for Officers Slater and Lora to secure the scene of the stop. Neither of the reasons Officer Slater gave for transporting Moneypenny to the police station in response to discovery are harmonious with Officer Slater's statement during the stop that Moneypenny was not going to jail and was only detained. Therefore, Officer Slater is not entitled to qualified immunity against Moneypenny's claims.

## III.  <u>CONCLUSION</u>

For these reasons, the Court **GRANTS** Officer Slater's Motion for Summary Judgment against Plaintiff Fred Haynes (ECF No. 29) and **DENIES** Officer Slater's Motion for Summary

Judgment against Plaintiff Shannon Moneypenny.

**IT IS SO ORDERED.**

**Date:   December 9, 2024**

_____
**CHARLES E. FLEMING**
**U.S. DISTRICT COURT JUDGE**